**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

| | |
|---|---|
| KRISTEN BIEL,<br>*Plaintiff-Appellant*,<br><br>v.<br><br>ST. JAMES SCHOOL, A CORP., a<br>California non-profit corporation;<br>DOES, 2–50, inclusive; ST. JAMES<br>CATHOLIC SCHOOL, a California non-<br>profit corporation; DOE 1,<br>*Defendants-Appellees.* | No. 17-55180<br><br>D.C. No.<br>2:15-cv-04248-<br>TJH-AS<br><br><br>OPINION |

Appeal from the United States District Court
for the Central District of California
Terry J. Hatter, District Judge, Presiding

Argued and Submitted July 11, 2018
Pasadena, California

Filed December 17, 2018

Before:  D. Michael Fisher,[*] Paul J. Watford,
and Michelle T. Friedland, Circuit Judges.

---

[*] The Honorable D. Michael Fisher, United States Circuit Judge for
the U.S. Court of Appeals for the Third Circuit, sitting by designation.

Opinion by Judge Friedland;
Dissent by Judge Fisher

## SUMMARY[**]

### Employment Discrimination

The panel reversed the district court's summary judgment in favor of the defendant and remanded in an employment discrimination action under the Americans with Disabilities Act.

Based on the totality-of-the-circumstances test articulated by the Supreme Court in *Hosanna-Tabor Evangelical Lutheran Church & School v. E.E.O.C.*, 565 U.S. 171 (2012), the panel held that the First Amendment's ministerial exception to generally applicable employment laws did not bar a teacher's claim against the Catholic elementary school that terminated her employment. The panel concluded that she did not qualify as a minister for purposes of the exception. The panel considered whether the school held the teacher out as a minister, whether her title reflected ministerial substance and training, whether she held herself out as a minister, and whether her job duties included important religious functions.

Dissenting, Judge Fisher wrote that, considering all of the circumstances of the teacher's employment, she was a "minister" for the purposes of the ministerial exception

---

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

because of the substance reflected in her title and the
important religious functions she performed.

## COUNSEL

Andrew S. Pletcher (argued), Cathryn G. Fund, and Joseph
M. Lovretovich, JML Law, Woodland Hills, California, for
Plaintiff-Appellant.

Jack Steven Sholkoff (argued), Ogletree Deakins Nash
Smoak & Stewart P.C., Los Angeles, California; Veronica
Fermin and Richard Chen, Ogletree Deakins Nash Smoak &
Stewart P.C., Costa Mesa, California; for Defendant-
Appellee.

Susan Ruth Oxford (argued), Attorney; Barbara L. Sloan,
Acting Assistant Attorney General; Jennifer S. Goldstein,
Associate General Counsel; James L. Lee, Deputy General
Counsel; Office of the General Counsel, Equal Employment
Opportunity Commission, Washington, D.C.; for Amicus
Curiae Equal Employment Opportunity Commission.

## OPINION

FRIEDLAND, Circuit Judge:

Plaintiff Kristin Biel was fired from her fifth grade
teaching position at St. James Catholic School after she told
her employer that she had breast cancer and would need to
miss work to undergo chemotherapy. She now appeals the
district court's summary judgment ruling that her subsequent
lawsuit against St. James under the Americans with
Disabilities Act ("ADA") was barred by the First

Amendment's "ministerial exception" to generally applicable employment laws. We hold that, assessing the totality of Biel's role at St. James, the ministerial exception does not foreclose her claim. We therefore reverse and remand for further proceedings.

## I.

Biel received a bachelor's degree in liberal arts and a teaching credential from California State University, Dominguez Hills. After graduating in 2009, Biel worked at two tutoring companies and as a substitute teacher at several public and private schools. St. James, a Roman Catholic parish school within the Archdiocese of Los Angeles, hired Biel in March 2013 as a long-term substitute teacher. At the end of that school year, St. James's principal hired Biel as the school's full-time fifth grade teacher. Biel is herself Catholic, and St. James prefers to hire Catholic teachers, but being Catholic is not a requirement for teaching positions at St. James. Biel had no training in Catholic pedagogy at the time she was hired. Her only such training was during her tenure at St. James: a single half-day conference where topics ranged from the incorporation of religious themes into lesson plans to techniques for teaching art classes.

Biel taught the fifth graders at St. James all their academic subjects. Among these was a standard religion curriculum that she taught for about thirty minutes a day, four days a week, using a workbook on the Catholic faith prescribed by the school administration. Biel also joined her students in twice-daily prayers but did not lead them; that responsibility fell to student prayer leaders. She likewise attended a school-wide monthly Mass where her sole responsibility was to keep her class quiet and orderly.

Biel's contract stated that she would work "within [St. James's] overriding commitment" to Church "doctrines, laws, and norms" and would "model, teach, and promote behavior in conformity to the teaching of the Roman Catholic Church." St. James's mission statement provides that the school "work[s] to facilitate the development of confident, competent, and caring Catholic-Christian citizens prepared to be responsible members of their church[,] local[,] and global communities." According to the school's faculty handbook, teachers at St. James "participate in the Church's mission" of providing "quality Catholic education to . . . students, educating them in academic areas and in . . . Catholic faith and values."[1] The faculty handbook further instructs teachers to follow not only archdiocesan curricular guidelines but also California's public-school curricular requirements.

In November 2013, Biel received a positive teaching evaluation from St. James's principal, Sister Mary Margaret, measuring her performance in aspects both secular (*e.g.*, her lesson planning strategies) and religious (*e.g.*, displaying Church symbols in her classroom). The principal's written

---

[1] The dissent quotes extensively from the faculty handbook to support its arguments about the extent of Biel's religious role. It does so as if there is no dispute that the handbook imposed binding requirements on Biel's employment and provided an accurate depiction of her duties. But St. James did not rely on the faculty handbook in support of its motion for summary judgment, which might have been because the handbook's force and effect were contested—it is at least unclear what role, if any, the handbook played at the school and whether it actually reflected what teachers at the school were expected to do in practice. For example, Biel's employment agreement referenced "policies in the faculty handbook," but said that "the policies do not constitute a contractual agreement with [Biel]." At this stage of the proceedings, any factual uncertainties must be viewed in Biel's favor. *See Fresno Motors, LLC v. Mercedes Benz USA, LLC*, 771 F.3d 1119, 1125 (9th Cir. 2014).

evaluation praised Biel's "very good" work promoting a safe and caring learning environment, noted that she adapted her teaching methods to accommodate her students' varied learning styles, and observed that she encouraged social development and responsibility.   The principal also identified some areas for improvement: for instance, Biel's students had many items on their desks and two students were coloring in the pages of their books.

Less than six months after that evaluation—which was her first and only formal evaluation at St. James—Biel learned that she had breast cancer and informed the school administration that her condition required her to take time off to undergo surgery and chemotherapy.   Sister Mary Margaret told Biel a few weeks later that she would not renew Biel's contract for the next academic year, citing her belief that Biel's "classroom management" was "not strict" and that "it was not fair . . . to have two teachers for the children during the school year."

Biel sued St. James in the United States District Court for the Central District of California, alleging that her termination violated the ADA, which prohibits employment discrimination based on disability.   *See* 42 U.S.C. § 12112(a).   Following discovery, St. James moved for summary judgment, arguing that the First Amendment's ministerial exception to generally applicable employment laws barred Biel's ADA claims.   The district court agreed and granted summary judgment for St. James.

## II.

We review de novo a district court's grant of summary judgment. *Brunozzi v. Cable Commc'ns, Inc.*, 851 F.3d 990, 995 (9th Cir. 2017).   We also apply de novo review to determinations of law as well as to mixed questions of law

and fact that implicate the Religion Clauses. *Puri v. Khalsa*, 844 F.3d 1152, 1157 (9th Cir. 2017).

**III.**

**A.**

Religious organizations enjoy a broad right to select their own leaders.  The Supreme Court confirmed in *Hosanna-Tabor Evangelical Lutheran Church & School v. E.E.O.C.* that, as part of that right, the First Amendment's Establishment and Free Exercise Clauses "bar the government from interfering with the decision of a religious group to fire one of its ministers." 565 U.S. 171, 181 (2012); *see also* U.S. Const. amend. I.  The Court grounded this principle in a longstanding historical and jurisprudential concern with "political interference" in "matters of church government as well as those of faith and doctrine." *Id.* at 184, 186 (citations omitted).  When the ministerial exception applies, it categorically bars an employee's suit under otherwise generally applicable employment laws. *Puri v. Khalsa*, 844 F.3d 1152, 1164 (9th Cir. 2017).  When the ministerial exception does not apply, "courts [may] decide disputes involving religious organizations," so long as they, in accordance with the Religion Clauses, proceed "'without resolving [any] underlying controversies over religious doctrine.'" *Id.* (quoting *Maktab Tarighe Oveyssi Shah Maghsoudi, Inc. v. Kianfar*, 179 F.3d 1244, 1248 (9th Cir. 1999)).  These principles guide our analysis here.

Biel does not dispute that St. James, as a part of the Roman Catholic Archdiocese of Los Angeles, is the type of religious organization that could potentially invoke the ministerial exception as a defense.  The disagreement here is over whether Biel's employment fell within the exception.

In *Hosanna-Tabor*, the Supreme Court expressly declined to adopt "a rigid formula for deciding when an employee qualifies as a minister," and instead considered "all the circumstances of [the plaintiff's] employment." 565 U.S. at 190. *Hosanna-Tabor* is the only case in which the Supreme Court has applied the ministerial exception, so its reasoning necessarily guides ours as we consider the circumstances here.

*Hosanna-Tabor* involved a former teacher at a Lutheran school, Cheryl Perich, who alleged that the school fired her in violation of the ADA after she was diagnosed with narcolepsy. *Id.* at 178–79. The Court focused on four major considerations to determine if the ministerial exception applied: (1) whether the employer held the employee out as a minister, (2) whether the employee's title reflected ministerial substance and training, (3) whether the employee held herself out as a minister, and (4) whether the employee's job duties included "important religious functions." *Id.* at 192. Based on the totality of the circumstances, the Court concluded that Perich qualified as a minister for purposes of the ministerial exception.

First, the evangelical Lutheran church that operated the school in *Hosanna-Tabor* "held Perich out as a minister, with a role distinct from that of most of its members." *Id.* at 191. Its congregation granted her the title of "Minister of Religion, Commissioned" after electing her to that position. *Id.* In conjunction with that commission, the "congregation undertook to periodically review Perich's 'skills of ministry' . . . and to provide for her 'continuing education as a professional person in the ministry of the Gospel.'" *Id.*

Second, to be eligible to become a commissioned minister, Perich needed a substantial amount of religious training. She "had to complete eight college-level courses

in subjects including biblical interpretation, church doctrine, and the ministry of the Lutheran teacher" and pass an oral examination by a Lutheran college faculty committee. *Id.* She also had to obtain the endorsement of her local Lutheran synod by submitting letters of recommendation, a personal statement, and "written answers to various ministry-related questions." *Id.* These training requirements took Perich six years to complete.

Because of her status as a commissioned minister, Perich was eligible for, and succeeded in obtaining, a special category of teaching position: that of a "called" teacher. *Id.* at 177–78. In contrast to "lay" teachers who had one-year renewable terms, called teachers had open-ended contracts that "could be rescinded only for cause and by a supermajority vote of the congregation." *Id* at 177. The school hired lay teachers only when called teachers were unavailable, even though all teachers performed the same duties in the classroom. *Id.*

Third, Perich "held herself out as a minister of the Church." *Id.* at 191. She claimed a federal tax benefit reserved for employees "earning their compensation" in "the exercise of the ministry." *Id.* at 192. And she described herself as "feel[ing] that God [was] leading [her] to serve in the teaching ministry." *Id.*

Fourth, Perich had an "important role in transmitting the Lutheran faith to the next generation." *Id.* at 192. In addition to teaching her fourth grade students various secular and religious subjects, Perich led them in prayer three times a day. *Id.* Twice a year, she also led a school-wide chapel service at which she "cho[se] the liturgy, select[ed] the hymns, and deliver[ed] a short message based on verses from the Bible." *Id.*

Only after describing all of these aspects of Perich's position did the Supreme Court hold: "In light of these considerations—the formal title given Perich by the Church, the substance reflected in that title, her own use of that title, and the important religious functions she performed for the Church—we conclude that Perich was a minister covered by the ministerial exception." *Id.*

Biel, by contrast, has none of Perich's credentials, training, or ministerial background. There was no religious component to her liberal studies degree or teaching credential. St. James had no religious requirements for her position. And, even after she began working there, her training consisted of only a half-day conference whose religious substance was limited. Unlike Perich, who joined the Lutheran teaching ministry as a calling, Biel appears to have taken on teaching work wherever she could find it: tutoring companies, multiple public schools, another Catholic school, and even a Lutheran school.

Nor did St. James hold Biel out as a minister by suggesting to its community that she had special expertise in Church doctrine, values, or pedagogy beyond that of any practicing Catholic. St. James gave her the title "Grade 5 Teacher." Her employment was at-will and on a yearlong renewable contract, unlike Perich's unlimited term that could only be ended by a supermajority vote of the congregation. The dissent's analysis of Biel's title focuses on her duties at the school—as opposed to her education, qualifications, and employment arrangement—and thus improperly collapses considerations that the Supreme Court treated separately.[2]  Looking only to what the Court treated

---

[2] The dissent also ascribes the title "Catholic school educator" to Biel, but nowhere in St. James's briefing or summary judgment papers

as relevant to evaluating a job title, there is nothing religious "reflected in" Biel's title. *Hosanna-Tabor*, 565 U.S. at 192. In contrast to Perich's "Minister of Religion, Commissioned," and "called" teacher titles, it cannot be said that Grade 5 Teacher "conveys a religious—as opposed to secular—meaning."[3]    *Conlon v. InterVarsity Christian Fellowship*, 777 F.3d 829, 834–35 (6th Cir. 2015).

Also in contrast to Perich, nothing in the record indicates that Biel considered herself a minister or presented herself as one to the community. She described herself as a teacher and claimed no benefits available only to ministers.

Only with respect to the fourth consideration in *Hosanna-Tabor* do Biel and Perich have anything in common: they both taught religion in the classroom. Biel taught lessons on the Catholic faith four days a week. She also incorporated religious themes and symbols into her overall classroom environment and curriculum, as the school required. We do not, however, read *Hosanna-Tabor* to indicate that the ministerial exception applies based on this shared characteristic alone. If it did, most of the analysis in *Hosanna-Tabor* would be irrelevant dicta, given that Perich's role in teaching religion was only one of the four

---

has St. James ever suggested that this general description of its employees was part of Biel's title.

[3] We do not suggest that Biel's lack of a ministerial title is dispositive, nor do we "ma[ke] ordination status or formal title determinative of the exception's applicability." *Hosanna-Tabor Evangelical Lutheran Church & Sch. v. E.E.O.C.*, 565 U.S. 171, 202 (2012) (Alito, J., concurring). But, like the Supreme Court in *Hosanna-Tabor*, we look to her title as shorthand for "the substance reflected in that title." *Id.* at 192.

characteristics the Court relied upon in reaching the conclusion that she fell within the ministerial exception.

And even Biel's role in teaching religion was not equivalent to Perich's. In *Hosanna-Tabor*, the Supreme Court emphasized the importance of assessing both the amount of time spent on religious functions and "the *nature* of the religious functions performed." 565 U.S. at 194 (emphasis added); *see also id.* at 204 (Alito, J., concurring) ("What matters is that [the individual] played an important role as an instrument of her church's religious message and as a leader of its worship activities."). Biel's role in Catholic religious education was limited to teaching religion from a book required by the school and incorporating religious themes into her other lessons. Whereas Perich orchestrated her students' daily prayers, Biel's students themselves led the class in prayers. Biel gave students the opportunity to lead the prayers and joined in, but she did not teach, lead, or plan these devotions herself. Similarly, while Perich crafted and led religious services for the school, Biel's responsibilities at St. James's monthly Mass were only "to accompany her students," and "[t]o make sure the kids were quiet and in their seats." These tasks do not amount to the kind of close guidance and involvement that Perich had in her students' spiritual lives.

**B.**

St. James argues that we should reach a contrary conclusion in light of the Seventh Circuit's recent decision in *Grussgott v. Milwaukee Jewish Day School, Inc.*, 882 F.3d 655 (7th Cir. 2018), which held that the ministerial exception barred a Hebrew teacher's employment discrimination suit against a Jewish primary school that fired her after she was diagnosed with a brain tumor. Even assuming *Grussgott* was correctly decided, which we are not sure it was, the plaintiff

in *Grussgott* more closely resembled Perich than Biel does. Although the plaintiff in *Grussgott* lacked a formal religious title, she had obtained a certification in a Jewish curricular program called Tal Am—a curriculum that involved integrating religious teachings into Hebrew lessons, as the Seventh Circuit noted in its analysis of the plaintiff's job title. *Id.* at 659. The plaintiff had also "tout[ed] significant religious teaching experience," which "was a critical factor in the school hiring her." *Id.* at 659. She also prayed and performed rituals with her students. *Id.* at 660. For the reasons discussed above, Biel's role was less ministerial than that of the plaintiff in *Grussgott*.

The other post-*Hosanna-Tabor* cases on which St. James relies are likewise not analogous to this one. All of the plaintiffs in those cases had responsibilities that involved pronounced religious leadership and guidance.[4] In contrast, although Biel taught religion, the other considerations that guided the reasoning in *Hosanna-Tabor* and its progeny are

---

[4] *See, e.g.*, *Fratello v. Archdiocese of New York*, 863 F.3d 190, 205–08 (2d Cir. 2017) (principal who oversaw daily prayers, supervised planning for Masses, delivered religious speeches, and was required to obtain catechist certification and demonstrate "proficiency" in religious areas); *Conlon v. InterVarsity Christian Fellowship*, 777 F.3d 829, 835–36 (6th Cir. 2015) (certified "spiritual director" for an organization with the mission to evangelize students on college campuses whose duties included assisting others in finding "intimacy with God and growth in Christ-like character"); *Cannata v. Catholic Diocese of Austin*, 700 F.3d 169, 177-78 (5th Cir. 2012) (Church music director who independently selected music for Mass, trained cantors, and was "a lay liturgical minister actively participating in the sacrament"); *Temple Emanuel of Newton v. Mass. Comm'n Against Discrimination*, 975 N.E.2d 433, 443–44 (Mass. 2012) (plaintiff who taught only religious subjects at a synagogue's religious school that convened only after the regular school day and on Sundays and did not provide any instruction in non-religious subjects).

not present here.  Biel did not have ministerial training or titles.   And she neither presented herself as nor was presented by St. James as a minister.  At most, only one of the four *Hosanna-Tabor* considerations weighs in St. James's favor.  No federal court of appeals has applied the ministerial exception in a case that bears so little resemblance to *Hosanna-Tabor.   See, e.g.*, *Grussgott*, 882 F.3d at 661 (applying exception where "two of the four *Hosanna-Tabor* factors are present"); *Conlon*, 777 F.3d at 835 (same).  We decline St. James's invitation to be the first.

## C.

A contrary rule, under which any school employee who teaches religion would fall within the ministerial exception, would not be faithful to *Hosanna-Tabor* or its underlying constitutional and policy considerations.  Such a rule would render most of the analysis in *Hosanna-Tabor* irrelevant.  It would base the exception on a single aspect of the employee's role rather than on a holistic examination of her training, duties, title, and the extent to which she is tasked with transmitting religious ideas.

Such a rule is also not needed to advance the Religion Clauses' purpose of leaving religious groups free to "put their faith in the hands of their ministers."  *Hosanna-Tabor*, 565 U.S. at 188.  As the Supreme Court recounted in *Hosanna-Tabor*, the historical episodes that motivated the adoption of the Religion Clauses included struggles over whether the choice of parish ministers would be made by local vestries or instead by the British monarch, the Bishop of London, or colonial governors.  *Id.* at 183.  The Court likewise cited First Amendment architect James Madison's opinion that the President ought to have no role in the appointment of the Catholic Church's leadership in the territory of the Louisiana Purchase.  *Id.* at 184.  Although the

Supreme Court held that "the ministerial exception is not limited to the head of a religious congregation," *id.* at 190, the focus on heads of congregations and other high-level religious leaders in the historical backdrop to the First Amendment supports the notion that, to comport with the Founders' intent, the exception need not extend to every employee whose job has a religious component.[5]

The First Amendment "insulates a religious organization's 'selection of those who will personify its beliefs.'" *Puri*, 844 F.3d at 1159 (quoting *Hosanna-Tabor*, 565 U.S. at 188). But it does not provide carte blanche to disregard antidiscrimination laws when it comes to other employees who do not serve a leadership role in the faith. We cannot read *Hosanna-Tabor* to exempt from federal employment law all those who intermingle religious and secular duties but who do not "preach [their employers']

---

[5] Indeed, Congress has specified that nothing in the ADA or Title VII prohibits a religious organization from favoring members of a particular religion in its hiring decisions. *See* 42 U.S.C. § 12113(d)(1) (stating that the ADA "shall not prohibit a religious [organization] from giving preference in employment to individuals of a particular religion to perform work connected with the carrying on . . . of its activities."); 42 U.S.C. § 2000e-1(a) (stating that Title VII "shall not apply to . . . a religious [organization] with respect to the employment of individuals of a particular religion to perform work connected with the carrying on . . . of its activities."). But Congress did not exempt religious organizations from the ADA's or Title VII's prohibitions on discriminating on the basis of disability, race, color, sex, or national origin. That choice, coupled with the presumption of constitutionality enjoyed by congressional legislation, makes us especially hesitant to invalidate unnecessarily vast swaths of federal law as applied to many employees of religious organizations. *See United States v. Watson*, 423 U.S. 411, 416 (1976) (recognizing that a "strong presumption of constitutionality [is] due to an Act of Congress" (quoting *United States v. Di Re*, 332 U.S. 581, 585 (1948)).

beliefs, teach their faith, . . . carry out their mission . . . [and] guide [their religious organization] on its way." 565 U.S. at 196.

## IV.

For the foregoing reasons, we **REVERSE** the district court's grant of summary judgment to St. James and **REMAND**.[6]

---

FISHER, Circuit Judge, dissenting:

This appeal concerns whether Kristen Biel, a fifth grade teacher at a Roman Catholic elementary school, was a "minister" for the purposes of the ministerial exception. Contrary to the majority, I conclude that Biel was a minister. As a result, I would affirm the District Court's decision that Biel is barred from bringing an action against St. James under the Americans with Disabilities Act.

---

[6] On remand, St. James may of course argue that it did not violate the ADA because its stated pedagogical and classroom management concerns—not Biel's medical condition—were the basis for its decision not to renew Biel's contract. *See Snead v. Metro. Prop. & Cas. Ins. Co.*, 237 F.3d 1080, 1093 (9th Cir. 2001) (explaining that a nondiscriminatory and non-pretextual reason for termination is a defense to an ADA claim). Contrary to the dissent's implication, had St. James asserted a religious justification for terminating Biel, our holding would neither have commanded nor permitted the district court to assess the religious validity of that explanation, but rather only whether the proffered justification was the actual motivation for termination, or whether not wanting to accommodate Biel's disability was the motivation.

I

During Biel's one year of service as a full-time fifth grade teacher at St. James, her duties included teaching religion as well as secular subjects. She taught 30-minute religion classes four days a week. In her religion class, she used the curriculum from *Coming to God's Life*, a Catholic textbook chosen by the school principal, Sister Mary Margaret. Using that curriculum, Biel taught and tested the students in her religion class about the Catholic sacraments, the lives of Catholic Saints, Catholic prayers, Catholic social teaching, Gospel stories, and church holidays. In her secular classes, she was expected to incorporate Catholic teachings. She attended, as required by the school, a one day conference at the Los Angeles Religious Education Congress that covered methods of incorporating God into lessons.

To get a complete picture of Biel's role at St. James, we look at various documents concerning her employment, including her employment contract, a performance review, and the faculty handbook.[1] Biel signed an employment contract with St. James which indicated that her title was "Grade 5 Teacher." By signing the contract, Biel indicated that she understood that St. James's mission was "to develop and promote a Catholic School Faith Community within the

---

[1] The faculty handbook is specifically referenced in Biel's employment contract: "You shall be familiar with, and comply with the School's personnel policies and procedures . . . including policies in the faculty handbook." The handbook provides insight into St. James's expectations for faculty at the school. Like Biel's performance review, the handbook is a reflection of the role St. James intended Biel to fill. Regardless of whether it imposed contractual obligations on Biel, it is helpful to our determination of whether the relationship between Biel and St. James was that of a minister and church or merely an employee-employer relationship.

philosophy of Catholic education as implemented at [St. James], and the doctrines, laws, and norms of the Catholic Church." The contract also imposed several requirements on Biel, mandating that she:

- perform "[a]ll duties and responsibilities . . . within [St. James's] overriding commitment [to developing the faith community],"

- "model, teach, and promote behavior in conformity to the teaching of the Roman Catholic Church,"

- and "participate in School activities including School liturgical activities, as requested."

Sister Mary Margaret conducted an observational review of Biel's teaching performance during her first semester as the fifth grade teacher. Her review included a section evaluating "Catholic Identity Factors" in which she noted that there was "visible evidence of signs, sacramental [sic], traditions of the Roman Catholic Church in the classroom," and that the "[c]urriculum include[d] Catholic values infused through all subject areas."

In the Faculty/Staff Handbook, the school's mission statement was supplemented by nine "basic values" guiding the school faculty, including:

- Faith – "To personally demonstrate our belief in God . . . to actively take part in worship-centered school events"; and

- Joy – "To delight in and enjoy our noble position as Catholic educators . . . ."

The handbook also included the "Code of Ethics for Professional Educators in Catholic Schools" which explained that "[e]ducation has always been one of the most important missions of the Church. Its success depends upon the professional competence, quality, and commitment of the teacher who chooses to teach in a Catholic school." This Code of Ethics detailed various commitments that Catholic school teachers in the Archdiocese of Los Angeles were expected to fulfill. It explained that "Catholic school educators . . . are called to: Promote the peace of Christ in the world," and to:

> Seek and encourage persons who live a life consonant with gospel values and Catholic Church teachings [and] pursue the apostolate of teaching through the following:
>
> > - modeling the faith life and witness to the Faith Community on the parish, diocesan, national, and world levels;
> >
> > - exemplifying the teachings of Jesus Christ by dealing with children and adults in true love and justice.

In a section titled "Statement of Principles," the handbook listed "religious development" as one of the five goals of a St. James Catholic education. To achieve this goal, "[the staff] guide the spiritual formation of the student . . . and hope to help each child strengthen his/her personal relationship with God." The handbook further explained that staff implement that goal by:

> Teaching the Gospel message and Catholic
> doctrine in such a way as to make them
> relevant to everyday life . . .  Integrating
> Catholic thought and principles into secular
> subjects . . . Celebrating regularly scheduled
> Masses and seasonal prayer . . . Encouraging
> student participation in liturgical services . . .
> Providing opportunities for developing
> personal prayer and shared prayer in the
> classroom.

In April of her year as the fifth grade teacher, Biel was diagnosed with breast cancer. She informed Sister Mary Margaret of the diagnosis and that she would begin treatments in May. As described in the majority opinion, Sister Mary Margaret informed Biel that St. James would not renew her contract. Biel filed suit under the ADA, and St. James moved for summary judgment, relying on the ministerial exception. The District Court found the ministerial exception barred Biel's claims and granted the motion. Biel filed this appeal.

## II

The ministerial exception is an affirmative defense that "precludes application" of employment discrimination laws, like the ADA, to "claims concerning the employment relationship between a religious institution and its ministers." *Hosanna-Tabor Evangelical Lutheran Church & Sch. v. E.E.O.C.*, 565 U.S. 171, 188 (2012). I agree with the majority, that the Supreme Court's holding and reasoning in *Hosanna-Tabor* guides our analysis here.

The ministerial exception flows from the First Amendment; "[t]he Establishment Clause prevents the Government from appointing ministers, and the Free

Exercise Clause prevents it from interfering with the freedom of religious groups to select their own." *Id.* at 184. The exception bars discrimination claims because "the ministerial relationship lies so close to the heart of the church that it would offend the Free Exercise Clause simply to require the church to articulate a religious justification for its personnel decisions." *Bollard v. Cal. Province of the Soc'y of Jesus*, 196 F.3d 940, 946 (9th Cir. 1999); *see also N.L.R.B. v. Catholic Bishop of Chi.*, 440 U.S. 490, 502 (1979) (In discussing jurisdiction over religious schools, the Court observed "[i]t is not only the conclusions that may be reached by the Board which may impinge on rights guaranteed by the Religion Clauses, but also the very process of inquiry leading to findings and conclusions.").

The purpose of the exception is to "ensure[] that the authority to select and control who will minister to the faithful—a matter 'strictly ecclesiastical'—is the church's alone." *Hosanna-Tabor*, 565 U.S. at 194–95 (citation omitted) (quoting *Kedroff v. St. Nicholas Cathedral of Russian Orthodox Church in N. Am.*, 344 U.S. 94, 119 (1952)). Selection of such persons is a "core matter of ecclesiastical self-governance with which the state may not constitutionally interfere." *Bollard*, 196 F.3d at 946.[2]

---

[2] The majority suggests that because the ADA and Title VII lack a religious organization exemption, courts must take care not to "invalidate unnecessarily vast swaths of federal law as applied to many employees of religious organizations." Maj. Op. at 15 n.5. However, the ministerial exception is grounded in the First Amendment and operates independently of any exception granted by Congress. In *Bollard*, we held that "[d]espite the lack of a statutory basis for the ministerial exception, and despite Congress' apparent intent to apply Title VII to religious organizations as to any other employer, courts have uniformly concluded that the Free Exercise and Establishment Clauses . . . require a narrowing

The term "minister" is a term of art broader than the word's ordinary meaning. It "encompasses more than a church's ordained ministers." *Alcazar v. Corp. of the Catholic Archbishop of Seattle*, 627 F.3d 1288, 1291 (9th Cir. 2010). This is especially important because in our religiously diverse society, the ministerial exception recognized in *Hosanna-Tabor* must transcend the Protestant Christian concept of "ministers" to protect self-governance of all organizations of religious purpose. *Hosanna-Tabor*, 565 U.S. at 198 (Alito, J., concurring).

In *Hosanna-Tabor*, the teacher was a minister within the Protestant Christian framework, serving at an Evangelical Lutheran church and school. Courts must take care to apply the principles from *Hosanna-Tabor* without discounting ministerial relationships in contexts that do not bear the obvious linguistic markers that were available for the Court's consideration in *Hosanna-Tabor*. The ministerial exception "insulates a religious organization's 'selection of those who will personify its beliefs'" regardless of whether they bear the standard markers of a minister. *Puri v. Khalsa*, 844 F.3d 1152, 1159 (9th Cir. 2017) (quoting *Hosanna-Tabor*, 565 U.S. at 188). The totality of the circumstances approach serves that end, and "[a]s the Supreme Court has made clear, there is no 'rigid formula for deciding when an employee qualifies as a minister.'" *Id.* (quoting *Hosanna-Tabor*, 565 U.S. at 190).

---

construction" to prevent "constitutionally impermissible interference by the government." 196 F.3d at 945. We must apply the ministerial exception in this case "in order to reconcile the statute with the Constitution" regardless of whether the ADA contains an exception. *Id.* at 947.

To determine whether Biel is a minister for purposes of the exception, I proceed in three parts. First, I will summarize and examine the Supreme Court's analysis of the exception in *Hosanna-Tabor*. Second, I will consider how to weigh the four *Hosanna-Tabor* factors in the context of this case. Finally, I consider all of the circumstances of Biel's employment and conclude that the ministerial exception applies.

### A. *Analytical framework provided by the Supreme Court in Hosanna-Tabor*

In *Hosanna-Tabor*, the Supreme Court concluded that a "called teacher" at a Lutheran elementary school was a minister for the purposes of the ministerial exception. 565 U.S. at 190. The Court evaluated "all the circumstances of her employment." *Id.* Within that totality of the circumstances approach, the Court considered four factors: "[1] the formal title given [to the teacher] by the Church," which the majority describes as whether the employer held out the employee as a minister, "[2] the substance reflected in that title, [3] her own use of that title, and [4] the important religious functions she performed for the Church." *Id.* at 192. These factors indicate the importance of fact-intensive analysis in the application of the ministerial exception.

Justice Alito, joined by Justice Kagan, concurred to clarify that the employee's function, rather than his or her title or ordination status, is the key. *Hosanna-Tabor*, 565 U.S. at 198 (Alito, J., concurring). He went on to write that the exception "should apply to any 'employee' who . . . serves as a messenger or teacher of [the organization's] faith." *Id.* at 199. He explained that "[r]eligious autonomy means that religious authorities must be free to determine who is qualified to serve in positions of substantial religious importance," which includes "those who are entrusted with

teaching and conveying the tenets of the faith to the next generation." *Id.* at 200. Finally, Justice Alito described the previous approach of the appellate courts, including this Court, as a functional approach looking more at the functions of individuals than at their titles, and concluded that "[t]he Court's opinion today should not be read to upset this consensus." *Id.* at 204.

Justice Thomas also concurred, explaining that, in his view, courts applying the ministerial exception must "defer to a religious organization's good-faith understanding of who qualifies as its minister." *Id.* at 196 (Thomas, J., concurring). Justice Thomas reasoned that a "religious organization's right to choose its ministers would be hollow . . . if secular courts could second-guess the organization's sincere determination that a given employee is a 'minister.'" *Id.* at 197. This approach, he maintained, best serves the goals of the Free Exercise and Establishment Clauses because it does not risk causing religious groups—especially those outside of the mainstream—"to conform [their] beliefs and practices regarding 'ministers' to the prevailing secular understanding" for fear of being denied the exception. *Id.* (citing *Corp. of Presiding Bishop of Church of Jesus Christ of Latter-day Saints v. Amos*, 483 U.S. 327, 336 (1987)).

Since the publication of *Hosanna-Tabor*, we and other circuits have relied on a "totality-of-the-circumstances test." *Grussgott v. Milwaukee Jewish Day Sch., Inc.*, 882 F.3d 655, 661 (7th Cir. 2018), *cert. denied*, ___ S. Ct. ___ (2018); *see Puri*, 844 F.3d at 1160 (holding that, on the pleadings, the exception did not apply because of insufficient proof of religious duties, lack of presentation of the individuals as religious leaders, and absence of religious substance in the positions); *Conlon v. InterVarsity Christian Fellowship*, 777 F.3d 829, 835 (6th Cir. 2015) (finding only two of the

four factors applicable, but still holding that the "ministerial exception clearly applies"); *Fratello v. Archdiocese of New York*, 863 F.3d 190, 204–05 (2d Cir. 2017) ("*Hosanna-Tabor* . . . neither limits the inquiry to [the four factors it enumerates] nor requires their application in every case."). I will do the same here.

### B.  The Four Factors

#### i.  Formal title

Biel argues that she is not a minister because nothing in her formal title, Grade 5 Teacher, reflects a ministerial role. "[A]n employee is more likely to be a minister if a religious organization holds the employee out as a minister by bestowing a formal religious title." *Puri*, 844 F.3d at 1160. In *Hosanna-Tabor*, this factor weighed in favor of applying the exception because the school employed both "lay" and "called" teachers, and the plaintiff was "called." 565 U.S. at 177–78. "When Hosanna-Tabor extended her a call, it issued her a 'diploma of vocation' according her the title 'Minister of Religion, Commissioned.'" *Id.* at 191. Here, Biel never received any diploma or commissioning from the parish comparable to the teacher in *Hosanna-Tabor*. Her title is apparently secular.

However, as the majority recognizes, a title is merely an expression of how an employer holds its employee out to the community. Part of St. James's expression of Biel's role in the school is her designation as a "Catholic school educator[]" in the school's Code of Ethics. The Code conveyed to the community that Catholic school educators such as Biel would, among other things, "[p]romote the peace of Christ in the world." Biel's title is presumably both "Catholic school educator[]" and "Grade 5 Teacher," the

former contextualizing the latter. St. James thus holds Biel out as a distinctively Catholic Grade 5 Teacher.

This first factor could therefore indicate that Biel was a minister. In fact, some of the "called" language that was important to determining that the teacher in *Hosanna-Tabor* was a minister is also present in the faculty handbook in this case. For instance, in the Code of Ethics, under "Commitment to the Community," the handbook reads "As Catholic school educators, we are *called* to . . . [p]romote the peace of Christ in the world." (emphasis added).

Although it seems strained to read Biel's title as "Grade 5 Teacher" without considering references in the handbook to St. James's teachers as "Catholic school educators," such a reading may be appropriate at this stage in order to draw reasonable inferences in Biel's favor. Therefore, in the *Hosanna-Tabor* analysis, I consider Biel's title to be secular. This factor therefore weighs against recognizing her as a minister. However, her title is not dispositive. *Id.* at 193 ("[A] title, by itself, does not automatically ensure coverage."); *id.* at 202 (Alito, J., concurring) (a ministerial title is "neither necessary nor sufficient.").

### ii. Substance reflected in the title

In *Hosanna-Tabor*, this factor weighed in favor of applying the exception. The called teacher's title of "commissioned minister" reflected "a significant degree of religious training," including college-level theology, "followed by a formal process of commissioning." *Hosanna-Tabor*, 565 U.S. at 191. In contrast, Biel received no religious commissioning and her formal education consisted of a university degree in liberal studies and a teaching certification. She was not required to be endorsed by the parish or to go through extensive training.

The majority focuses narrowly on educational and practical training for the second factor in the *Hosanna-Tabor* analysis. However, I do not understand this second factor to be limited to education and practical training. The substance reflected in a title is broader than mere educational or practical prerequisites. *See Grussgott*, 882 F.3d at 659–660. Considering other elements under the second factor facilitates the ministerial exception's application to different religions, including those that may not require formal training for ministers. It also compliments Justice Thomas's emphasis on the religious organization's own sincere determination of who ministers the faith. *Hosanna-Tabor*, 565 U.S. at 196–97 (Thomas, J., concurring). If we expected all ministers to receive formal religious education, we would improperly restrict the exception.

Instead, I conclude that the substance underlying Biel's title at St. James consists of the school's expectation, to which Biel specifically consented in her employment contract, that she propagate and manifest the Catholic faith in all aspects of the role. Importantly, the substance of Biel's title of Grade 5 Teacher encompassed the role of religion teacher.

The approach of analyzing the second factor as reflective of how the religious organization understood an employee's role is also consistent with at least two of our sister Circuits' interpretations. In *Fratello*, the Second Circuit ultimately concluded that a "lay principal" of a Catholic elementary school was a minister. 863 F.3d at 206, 210. In evaluating this title, the court observed that though the principal was "not strictly required to meet any formal religious-education requirements, the substance reflected in that title as used by the defendants and conveyed to the plaintiff entails proficiency in religious leadership." *Id.* at 208. Similarly, the

Seventh Circuit in *Grussgott* held that the second factor weighed in favor of applying the exception to a Hebrew language teacher at a Jewish school, not only because of her religious training, but also because "the substance of [the teacher's] title as conveyed to her and as perceived by others entails the teaching of the Jewish religion to students." 882 F.3d at 659–60.

The majority distinguishes *Grussgott* based on the teacher's Tal Am certification, but in *Grussgott*, the Seventh Circuit specifically noted that there was nothing in the record indicating what the Tal Am certification entailed beyond completion of seminars. *Id.* at 659. Though the Seventh Circuit found that the teacher's Tal Am certification was not material to its analysis, the court nevertheless held that the teacher's curriculum and experience teaching religion "support[ed] the application of the ministerial exception" at the second factor. *Id.* at 660. Contrary to the majority's conclusion, this case is not distinguishable from *Grussgott* based on a certification that may or may not have indicated any significant degree of education or training. The Seventh Circuit's consideration of curriculum and teaching experience under the second *Hosanna-Tabor* factor supports the conclusion that this factor encompasses more than just training.

Even more explicitly than in *Grussgott*, the substance of Biel's title as the Grade 5 Teacher encompasses her responsibility for all facets of her pupils' education, which unquestionably includes religion class and imparting the substantive teachings of the Catholic faith. In addition to her role as the religion teacher, Biel agreed in her contract that she "understood that the mission of the School [was] to develop and promote a Catholic School Faith Community within the philosophy of Catholic education as implemented

at the School, and the doctrines, laws and norms of the Catholic Church." The faculty handbook extensively prescribes how the faculty should model the Catholic faith and promote religious development. Additionally, Biel was required to attend a Catholic education conference, which focused on incorporating religion into lesson plans. Finally, her contract was approved by both St. James's principal, Sister Mary Margaret, and the pastor of the parish, and it clarified that her role as a fifth grade teacher included teaching religion, specifically the Catholic faith. Because all of these expectations were included in Biel's role and in the title given to her by St. James, I conclude that her title reflected significant religious substance. This factor therefore weighs in favor of applying the exception.

### iii. Biel's own use of the title

"[A]n employee who holds herself out as a religious leader is more likely to be considered a minister." *Puri*, 844 F.3d at 1160. In *Hosanna-Tabor*, the teacher "held herself out as a minister of the Church" in several ways, including "accepting the formal call to religious service," "claim[ing] a special housing allowance on her taxes" available only to ministers, and indicating, post-termination, "that she regarded herself as a minister at Hosanna-Tabor." 565 U.S. at 191–92. Here, although Biel taught her students the tenets of the Catholic faith, she did not present herself to the public as a minister. *See Conlon*, 777 F.3d at 835 (concluding that this factor was not present when the employee did not have a "public role of interacting with the community as an ambassador of the faith"). This factor therefore weighs against concluding that Biel was a minister.

### iv. Important religious functions performed

In *Puri*, this Court emphasized that employees who have "a role in conveying the Church's message and carrying out its mission" are likely ministers "even if [they] devote[] only a small portion of the workday to strictly religious duties." *Puri*, 844 F.3d at 1160 (internal citation and alterations omitted). In *Hosanna-Tabor*, the teacher was responsible for "'leading others toward Christian maturity' and 'teaching faithfully the Word of God, the Sacred Scriptures, in its truth and purity and as set forth in all the symbolical books of the Evangelical Lutheran Church.'" 565 U.S. at 192 (alterations omitted) (quoting the record). The *Hosanna-Tabor* teacher taught religion four days a week, led her students in prayer three times a day, took students to school-wide chapel services once a week, and led that chapel service approximately twice a year. *Id.* Based on those duties, the Supreme Court concluded that "[a]s a source of religious instruction, [the teacher] performed an important role in transmitting the Lutheran faith to the next generation." *Id.* The Court indicated that it would be error to give too much weight to secular duties performed in addition to religious ones or to the fact that "others not formally recognized as ministers . . . perform the same functions." *Id.* at 193.

Biel's duties as the fifth grade teacher and religion teacher are strikingly similar to those in *Hosanna-Tabor*. She taught religion class four times a week based on the catechetical textbook *Coming to God's Life*. In that class, she was responsible for instructing her students on various areas of Catholic teachings, including Catholic sacraments, Catholic Saints, Catholic social teaching, and Catholic doctrine related to the Eucharist and the season of Lent. She prayed Catholic prayers with her students twice each day and

attended monthly school mass with her class.[3] Additionally, she, like all teachers at St. James, was evaluated on incorporating "signs, sacramental [sic], [and] traditions of the Roman Catholic Church in the Classroom" and "infus[ing] [Catholic values] through all subject areas." "As a source of religious instruction, [she] performed an important role in transmitting the [Catholic] faith to the next generation." *Id.* at 192. For these reasons, this factor weighs heavily in favor of considering Biel to be a minister. Biel was "expected to model, teach, and promote behavior in conformity to the teaching of the Roman Catholic Church" according to her employment contract, and was subject to termination if she failed to meet that expectation.

This analysis comports with the approach of the Seventh Circuit which held that a Hebrew language teacher "performed 'important religious functions' for the school" when she "taught her students about Jewish holidays, prayer, and the weekly Torah readings . . . [and] practiced the religion alongside her students by praying with them and performing certain rituals." *Grussgott*, 882 F.3d at 660 (quoting *Hosanna-Tabor*, 565 U.S. at 192). The duties of the teacher in *Grussgott* are found in Biel's case as well. My

---

[3] The majority interprets Biel's testimony to be that she joined her students in prayer, but did not lead the fifth graders in prayer. However, the record indicates that Biel's prayer leaders led the class in prayer: "I had prayer leaders. The prayers that were said in the classroom were said mostly by the students. We had prayer leaders." The faculty handbook set the expectation that Biel would "[p]rovid[e] opportunities for developing personal prayer and shared prayer in the classroom." Under "Daily Prayer" in the "Staff Guidelines and Responsibilities" section of the faculty handbook, there is a school-wide policy of beginning and ending the day with prayer. To accept Biel's testimony that she merely joined the fifth graders in *their* prayers minimizes significant portions of the record.

conclusion on this factor is also consistent with the Sixth Circuit's approach in *Conlon*, which ruled that job duties such as "assist[ing] others to cultivate 'intimacy with God and growth in Christ-like character through personal and corporate spiritual disciplines'" constituted important religious functions. 777 F.3d at 835.

It is clear that Biel's job duties "reflected a role in conveying the Church's message and carrying out its mission." *Hosanna-Tabor*, 565 U.S. at 192. However, Biel argues that whatever her duties were, she executed them in a decidedly secular manner. She claims that her religious instruction was straight out of a textbook—just like with secular classes—and that her only job at mass was "to make sure the kids were quiet and in their seats." Appellant's Br. at 47. Her claim that she executed her duties in a secular manner directly conflicts with her contractual agreement to "integrate Catholic thought" into subjects, "celebrate regularly scheduled Masses . . . with students," and "encourage student participation in liturgical services." In fact, under "Staff Guidelines and Responsibilities" in the handbook, teachers are specifically expected to do more than merely keep their elementary students quiet during mass— they are expected to prepare their students for mass: "Teachers prepare their students to be active participants at Mass, with particular emphasis on Mass responses." Biel indicated that her students participated in mass by presenting the gifts, i.e., the Eucharist. Biel's students were trained to present the gifts, and Biel was available to review the practice with them if necessary. Biel's role at mass was also to personally demonstrate her faith through active participation in "worship-centered school events." Biel's role as an "exemplar[] of practicing" Catholics would not make her a minister if that were her only religious function. *See E.E.O.C. v. Miss. College*, 626 F.2d 477, 485 (5th Cir.

1980). But because the determination of who is a minister is a totality of the circumstances test, I consider "all the circumstances of her employment" in the assessment of her role. *Hosanna-Tabor*, 565 U.S. at 190.

Biel's argument that she performed her duties in a secular manner invites the very analysis the ministerial exception demands we avoid. The courts may not evaluate the relative importance of a ministerial duty to a religion's overall mission or belief system. The very duties that Biel attempts to trivialize, e.g. teaching Church doctrine and requiring participation and attentiveness during mass, could easily be considered essential to the faith and its conveyance to the next generation, and she very well could have been terminated for failures in this area.

Consideration of her claims in federal court would require the evaluation of "the importance and priority of the religious doctrine in question, with a civil factfinder sitting in ultimate judgment of what the accused church really believes, and how important that belief is to the church's overall mission." *Hosanna-Tabor*, 565 U.S. at 206 (Alito, J., concurring). We must avoid entangling the courts in this sort of analysis. In *Alcazar*, this Court cited a Seventh Circuit case that discussed the kind of government interference in religious affairs that the ministerial exception is designed to avoid. 627 F.3d at 1292 (citing *Tomic v. Catholic Diocese of Peoria*, 442 F.3d 1036, 1040 (7th Cir. 2006), *abrogated by Hosanna-Tabor*, 565 U.S. 171)). The *Tomic* court explained that if a suit were allowed to go forward between a minister and a church, the church would defend its adverse employment decision with a religious reason. The employee would argue that the religious reason was a farce, and the real reason was one prohibited by statute. In response the church would provide evidence of the religious reason,

which the employee would dispute. The court would then have to "resolve a theological dispute" in the course of its adjudication of the claim. *Tomic*, 442 F.3d at 1040 (citing *DeMarco v. Holy Cross High Sch.*, 4 F.3d 166, 171 (2d Cir. 1993)). The Religion Clauses do not permit such entanglement in the affairs of religious organizations.

The Seventh Circuit rejected a similar argument in *Grussgott* when the Hebrew teacher attempted to portray her role as teaching from a "culturally" Jewish perspective rather than a religious perspective. For example, the teacher attempted to distinguish between "leading prayer, as opposed to 'teaching' and 'practicing' prayer with her students." 882 F.3d at 660. Her argument did not prevail because a teacher's "opinion does not dictate what activities the school may genuinely consider to be religious." *Id.* Similarly here, how Biel subjectively approached her duties is not relevant, let alone determinative.

### C.  Consideration of all the circumstances

Because the Supreme Court refused "to adopt a rigid formula," this Court should not treat the four *Hosanna-Tabor* factors as a strict test. *Hosanna-Tabor*, 565 U.S. at 190. Instead, the Court should take a step back and consider whether "all the circumstances of [Biel's] employment" require that her claims be barred by the ministerial exception. *Id.*

In reconciling the four factors with the totality of the circumstances approach, the Seventh Circuit reasoned that where two factors weighed in favor of the exception and two weighed against, "it would be overly formalistic" to simply

"call [the] case a draw." *Grussgott*, 882 F.3d at 661.[4] I agree. *See also Conlon*, 777 F.3d at 835 (applying ministerial exception when two factors were present); *Cannata v. Catholic Diocese of Austin*, 700 F.3d 169, 177 (5th Cir. 2012) ("Application of the exception . . . does not depend on a finding that [the employee] satisfies" the four factors.). The Seventh Circuit in *Grussgott* ultimately applied the ministerial exception because "[t]he school intended [the teacher] to take on a religious role, and in fact her job entailed many functions that simply would not be part of a secular teacher's job." 882 F.3d at 661. The court held that "it [was] fair to say that, under the totality of the circumstances in this particular case, the importance of [the teacher's] role as a 'teacher of faith' to the next generation outweighed other considerations." *Id.* (alteration omitted) (quoting *Hosanna-Tabor*, 565 U.S. at 199 (Alito, J., concurring)). So too here.

In considering the complete picture of Biel's employment, I am struck by the importance of her stewardship of the Catholic faith to the children in her class. Biel's Grade 5 Teacher title may not have explicitly announced her role in ministry, but the substance reflected in her title demonstrates that she was a Catholic school educator with a distinctly religious purpose. The religious purpose of Catholic school educators is not new to the federal courts. The Supreme Court has long "recognized the critical and unique role of the teacher in fulfilling the mission of a church-operated school." *Catholic Bishop*, 440 U.S. at 501 (discussing *Lemon v. Kurtzman*, 403 U.S. 602, 617 (1971)). Biel expressly acknowledged this purpose in her

---

[4] The Seventh Circuit described the Hebrew teacher's title and whether she held herself out as a minister as "formalistic factors . . . greatly outweighed by [her] duties and functions."

contract, and committed herself to performing all "duties and responsibilities . . . within [the] overriding commitment" of St. James to "develop and promote a Catholic School Faith Community within the philosophy of Catholic education." Biel acknowledged that her continued employment was dependent upon her demonstrated ability to do so. Drawing all inferences in Biel's favor, it is still impossible to ignore that her position at St. James was pervaded by religious purpose.

Looking at each of the *Hosanna-Tabor* factors, and considering the evidence in its totality without adherence to a formulaic calculation, it appears that Biel was a minister, though perhaps not as obviously as the teacher in *Hosanna-Tabor*. However, the teacher in *Hosanna-Tabor* was within the Protestant Christian framework, and therefore the terminology of her employment very neatly fit within the ministerial exception. We must not make the mistake of tethering the exception too close to the Protestant Christian concept of ministers. *See Hosanna-Tabor*, 565 U.S. at 198 (Alito, J., concurring).

The ministerial exception protects the relationship between a church and its ministers. It does not require a church to assert a religious reason for an employment decision. I fear that the majority's opinion will undermine this protection. The majority holds that "had St. James asserted a religious justification for terminating Biel, our holding would neither have commanded nor permitted the district court to assess the religious validity of that explanation, but rather only whether the proffered justification was the actual motivation for termination." Maj. Op. at 2 n.6. But the majority misses the point of the ministerial exception, which is to shield the relationship between a church and its ministers from the eyes of the court

without requiring the church to provide a religious justification for an adverse employment decision. *Hosanna-Tabor*, 565 U.S. at 194–95 ("The purpose of the exception is not to safeguard a church's decision to fire a minister only when it is made for a religious reason. The exception instead ensures that the authority to select and control who will minister to the faithful . . . is the church's alone.").

\*\*\*

This case demonstrates that the First Amendment's guarantees are not without cost. The ADA protects some of the most vulnerable people in our society from discrimination. It is an incredibly important statutory protection. But "[t]he First Amendment, of course, is a limitation on the power of Congress," and any exercise of statutory rights under the ADA requires the courts "to decide whether that [is] constitutionally permissible under the Religion Clauses of the First Amendment." *Catholic Bishop*, 440 U.S. at 499. We are necessarily bound by the Supreme Court's adoption of the ministerial exception, and its guarantee of noninterference in religious self-governance. If the exception is to provide sufficient protection for religious freedom, courts must give the exception a broad application. *Puri*, 844 F.3d at 1159.

In light of these considerations, *Hosanna-Tabor*, and all the circumstances of this case, I would conclude that the ministerial exception does apply to Biel in her capacity as the fifth grade teacher at St. James because of the substance reflected in her title and the important religious functions she performed. These factors outweigh her formal title and whether she held herself out as a minister. Ultimately, Biel was "entrusted with teaching and conveying the tenets of the faith to the next generation." *Hosanna-Tabor*, 565 U.S. at 200 (Alito, J., concurring). Those responsibilities render her

the "type of employee that a church must be free to appoint or dismiss in order to exercise the religious liberty that the First Amendment guarantees." *Id.* at 206.

### III

For the above reasons, I respectfully dissent. I would affirm the ruling of the District Court.